## RED JACKET OIL & GAS CO. v. UNITED FUEL GAS CO.

### No. 3494.

District Court, S. D. West Virginia.

Oct. 16, 1943.

398

Landon C. Bell and William B. Hogg, both of Columbus, Ohio, and W. Chapman Revercomb and Brown, Jackson & Knight, all of Charleston, W. Va., for plaintiff.

Harold A. Ritz, Robert S. Spilman, and B. J. Pettigrew, all of Charleston, W. Va., for defendant.

MOORE, District Judge.

This suit in equity was begun on September 17, 1935. At that time the plaintiff (herein called "Red Jacket") filed a bill of complaint against the defendant (herein called "Fuel") alleging numerous violations of a gas sales agreement made between the parties on July 27, 1929. It prayed for an accounting for damages alleged to have been caused by Fuel and for an injunction against alleged continuing violations of the agreement.

Fuel is a large producer, buyer, transporter, and seller of natural gas, operating wells and transportation lines in the Mingo-Wayne gas district of West Virginia and elsewhere. Red Jacket is lessee of lands in this district, on which it operated fifteen gas wells, most of which are still producing gas.

The term of the gas sales agreement was five years from its date "and so much longer thereafter as gas may be produced from said leased premises in marketable quantities." Red Jacket agreed to sell, and Fuel agreed to buy, the gas produced from the premises leased by Red Jacket at a price of 12 cents per thousand cubic feet (hereinafter abbreviated to "mcf.")

Fuel owned and operated a 16-inch line known as Line V, which extended approximately east and west from Chapmanville in Logan County to Kermit in Mingo County. At the latter place Fuel maintained a large compressor station by means of which the pressure of the gas in Line V was regulated at will. Fuel also owned a 6-inch receiving line known as the Jude Branch Line, extending northward and westward from Line V for a distance of about ten miles. The Jude Branch Line received gas from twenty-four or more of Fuel's gas wells and also received the casing head gas from nineteen oil wells owned by Fuel known as the Slick Rock wells, which will be later discussed. This gas was delivered into Line V. By the terms of the gas sales agreement, Fuel agreed to construct an 8-inch line which would connect with Line V and extend through the main properties leased by Red Jacket so as to receive the gas from Red Jacket's wells. This 8-inch line was constructed shortly thereafter and was known as the Kirk Branch Line. It joined Line V at a point about three miles from the point of intersection of the Jude Branch Line with Line V, and between that point and the compressor station at Kermit. All of Red Jacket's gas wells were connected with the Kirk Branch Line, as were also nine of Fuel's wells and several wells operated by Southeastern Fuel Company and by Frank Yates, the product of which wells was purchased by Fuel.

It is not necessary to quote the gas sales agreement in full. The paragraphs which Fuel is alleged to have violated are the following:

"Third: The lands embraced in Seller's lease hereinbefore referred to, and covered

by this contract, lie within what is known as the Mingo and Wayne Counties, West Virginia, gas fields, and comprise a part of those fields. Said fields shall, for the purpose of this agreement, be known as the Mingo-Wayne Gas District, and it is contemplated and agreed by and between the parties hereto, that so long as this agreement remains in force, all gas delivered into Buyer's lines, from said district including that produced by Buyer from lands on properties owned or controlled by it, shall be delivered and accepted under equivalent conditions and on equal terms, with reference to all important factors such as head or line pressure against which Seller's gas or other gas from said district is delivered, and the means by which gas is introduced or forced into Buyer's receiving lines. That is to say, that Seller shall at no time be discriminated against, or placed at a disadvantage, actually or relatively, as compared with any other producer of gas in said district, including the Buyer, making deliveries of gas into Buyer's receiving line or lines, by being required to deliver its gas to Buyer against a higher pressure or against any discrimination whatsoever; nor shall Buyer allow other producers in said district to force their gas into Buyer's receiving line or lines by Compressors, Boosters, Pumps or other artificial means; nor shall the Buyer force gas produced by it into its own lines, by such means, unless employed in such manner as to work equally and fully to the aid and advantage of the Seller. It is agreed and understood, however, that Buyer may, at its option, erect or acquire, and maintain and operate, a Booster station in said district, through which Seller's gas and all other gas (including that produced by Buyer) received by Buyer from said district, shall pass on equal terms and under like conditions as to pressure, into Buyer's receiving lines."

"Fourth: It is mutually agreed between the parties hereto, that during the continuance of this contract Buyer will, during the winter months, beginning November 1st and ending April 30th of each year, accept, receive and pay for all of the gas which Seller is able to deliver and does deliver into Buyer's receiving line or lines in accordance with the terms of this contract; but during the summer months, beginning May 1st and ending October 31st, Buyer shall only be required to take only one-third of the volume of gas that was taken during the preceding six months; and it is further understood and agreed that the said volume to be so taken in said six summer months may be taken throughout each and every day, by partially closing gates and other similar means to reduce the flow to the required capacity, or it may be taken by using the well or wells one-third of the time during such summer months, or in any other manner, so that the required quantity of gas be taken. It is agreed that in the event the pressure of gas from Seller's gathering lines becomes so high as to endanger Buyer's lines, then Buyer may choke back the gas to a point of safety."

Fuel answered, denying all material charges contained in the bill of complaint. The case was referred to a Special Master to take evidence and to report his findings of fact and conclusions of law as to all questions in controversy, including the amount of damages, if any, sustained by Red Jacket. A great volume of testimony comprising nearly 2,500 pages was taken, 75 exhibits were filed by Red Jacket, and 46 by Fuel. The Master completed his report on July 10, 1942. Thereafter, suggestions were filed by both parties in accordance with Federal Rules of Civil Procedure, rule 53(e) (5), 28 U.S.C.A. following section 723c. The Master then prepared a supplemental report, in which the suggestions were considered, but the original findings were substantially adhered to. After the filing of the Master's original and supplemental reports, both parties objected to certain parts of the report. These objections were heard and considered by the court with the help both of oral argument and exhaustive briefs. The case is now to be decided upon the objections of the parties to the Master's report.

Red Jacket in its bill of complaint alleged the following acts and omissions on the part of Fuel, which Red Jacket claimed were violations of the sales agreement:

1. That Fuel did not permit Red Jacket to deliver gas during the summer months in quantities proportionate to the quantities which Fuel marketed from its own wells; the contention being that since Fuel marketed from its own wells during the summer months more than one-third as much gas as it marketed from its wells during the winter months, Red Jacket's summer deliveries should have been increased proportionately.

2. That Fuel operated a compressor station (called the Jude Branch compres-

sor) on the Jude Branch Line during a limited period of time.

3. That Fuel operated another compressor station (called the Slick Rock compressor) on the Jude Branch Line, by means of which it delivered into the Jude Branch Line casing head gas from the nineteen Slick Rock wells, which had a rock pressure of only four or five pounds, and the gas from which could not have been delivered into the line without the aid of a compressor.

4. That Fuel installed a 4-inch regulator near the junction of the Kirk Branch Line with Line V, thereby, as alleged, choking back Red Jacket's gas and preventing its delivery into Line V.

5. That Fuel maintained line pressures which were discriminatory as between Fuel's wells and those of Red Jacket.

6. That Red Jacket's wells were drained of gas by Fuel's wells, largely as a result of the foregoing alleged violations of the gas sales agreement.

The Master reported his findings as to each of the alleged violations. These findings will now be considered, but inasmuch as no objections were filed to certain of the findings, these will be first discussed before taking up for consideration the findings as to which objections were filed.

*Jude Branch Compressor.*

The Master found that Fuel operated the Jude Branch compressor between the date of the gas sales agreement and May 1, 1930, when it was discontinued by Fuel at the request of Red Jacket. Since Red Jacket offered no proof of any damages resulting from the operation of the Jude Branch compressor, the Master found that, while its operation constituted a technical violation of the agreement, Red·Jacket was entitled to no relief therefor, and this finding, not being objected to by Red Jacket, is adopted by the court.

*Kirk Branch Regulator.*

The Master found that on December 31, 1931, or January 1, 1932, Fuel began using a regulator on the Kirk Branch Line, which was removed from the line in July, 1933, and not thereafter used; that this regulator had a maximum orifice of 4 inches, and that during its operation the gas in the 8-inch Kirk Branch Line was required to pass through 25 feet of 4-inch pipe before reaching Line V; that the installation and use of this regulator for the purpose of equalizing pressures and deliveries between the

Kirk Branch Line and the Jude Branch Line amounted to a breach of the gas sales agreement, because it had the effect of destroying "both the natural and contractual" rights of Red Jacket by deferring the taking of gas which Red Jacket was entitled to deliver; but that no proof was offered by Red Jacket as to the amount of damages it suffered because of the installation and use of the Kirk Branch regulator. Therefore the Master found that there was no basis for awarding damages to Red Jacket as a result of the installation and operation of the Kirk Branch regulator, although the Master stated that he considered these circumstances in dealing with the question of damages in his finding in respect of summer-winter ratio of deliveries, which is later discussed.

Red Jacket filed no objection to this finding. I do not deem it necessary to decide whether or not the installation and operation of the Kirk Branch regulator was a violation of the gas sales agreement. The facts in connection with the Kirk Branch regulator and its method of operation were not in dispute. The Master's finding to the effect that these facts showed a violation of the agreement was a conclusion of law based on his interpretation of the language of the gas sales agreement. I adopt the Master's findings of fact, but make no decision here with reference to any liability on the part of Fuel resulting therefrom, other than to hold that since Red Jacket filed no objection to the Master's findings upon this phase of the case, those findings will not be disturbed.

*Discriminatory Line Pressure.*

The Master finds as facts that the Kirk Branch regulator and a manually operated gate valve which was used on the Jude Branch Line were so operated by Fuel as approximately to equalize pressures in the two lines; that this equalization of pressures tended to eliminate the natural differential in line pressure existing between the points of connection with main Line V of the Jude Branch and Kirk Branch Lines, respectively, and tended to destroy the advantage to Red Jacket resulting from the fact that the Kirk Branch Line normally had a potential capacity two and three-fourths times greater than that of the Jude Branch Line. He concluded that this equalization of pressures was inequitable and against the spirit of the gas sales agreement; and that there was some slight actual discrimination in line pressure, par-

ticularly during the years 1932–1933; but he found further as a fact that there is no evidence in the record to sustain a finding as to the damages suffered by Red Jacket resulting from such equalization or discrimination, and that there was some evidence by Red Jacket's witnesses that the effect on volume of production was not great. He therefore made no finding of damages in this respect, but stated that the circumstances were partially taken into account when dealing with the matter of summer-winter ratio, which is later discussed.

Here again, in view of the findings of fact made by the Master, determination of the question whether or not Fuel can be said to have violated the terms of the gas sales agreement is a matter of law which can be settled only by reference to and interpretation of the provisions of that agreement. The Master's findings of fact in respect of discriminatory line pressures are adopted by the court; and Red Jacket having made no objection to the finding that no damages have been shown as the result of discriminatory line pressures, the Master's findings with regard to these matters will stand approved; although I do not deem it necessary here to decide whether the equalization by Fuel of line pressures as between the Kirk Branch Line and the Jude Branch Line was or was not a violation of the terms of the gas sales agreement.

*Drainage.*

The principal controversy in this suit, according to the Master's report, and as shown by the voluminous transcript of evidence and the large number of exhibits filed, revolved about the question of drainage. Red Jacket endeavored to show that by the operation of the Slick Rock compressor, the use of the Kirk Branch regulator, and the maintenance of discriminatory line pressures, Fuel had choked back the gas from Red Jacket's wells, and had created drainage channels through which gas which would otherwise have been produced and marketed from Red Jacket's wells was diverted into wells and lines of Fuel. The evidence relating to damage from drainage was largely and, in fact, almost entirely of a character intended to prove the quantities of gas which it was claimed had been so diverted, and for which Red Jacket claimed payment at the agreed price of 12 cents per mcf. Little or no attempt was made by Red Jacket to show within any degree of certainty what quantities of its gas, if any, had been choked back or crowded out of the receiving lines by acts of Fuel in alleged violation of the gas sales agreement, and delivery thereof deferred or delayed contrary to the terms of the agreement.

The Master found as a fact that no drainage had occurred. Red Jacket did not object to this finding, which I adopt and approve as the finding of the court; and, therefore, the chief element in the case is no longer in controversy.

Though Red Jacket made no objection to any of the foregoing findings of the Master, they were objected to by Fuel, in so far as Fuel was held by any of those findings to have violated any of the terms of the gas sales agreement, and in so far as the Master, while not allowing independent damages by reason of the operation of the Kirk Branch regulator and the maintenance of equalized or discriminatory line pressures, took those matters into consideration in allowing damages for other alleged violations, as will now be discussed. My decision on the other aspects of the case makes it unnecessary to pass upon these objections of Fuel, which will therefore not be further considered.

There remain for consideration two phases of the case, which the Master decided favorably in part to Red Jacket. These are: (a) Red Jacket's claim for damages arising from the alleged failure of Fuel to permit it to make summer deliveries in the same proportion to its winter deliveries as that which Fuel's own gas marketed in the summer months bore to the quantities marketed by Fuel in the winter months; and (b) Red Jacket's claim for damages due to the operation by Fuel of the Slick Rock compressor.

*Summer-Winter Ratio.*

The Master found that the gas sales agreement gave to Red Jacket the right, notwithstanding the limitation of paragraph Fourth, to deliver during the summer months more than one-third of its winter deliveries if and when Fuel marketed during the summer months more than one-third of its own winter production. He reasoned, in effect, that since paragraph Third of the agreement provided that "Seller shall at no time be discriminated against, or placed at a disadvantage, actually or relatively, as compared with any other producer of gas in said district, including the Buyer, making deliveries of gas into Buyer's receiving line or lines, by

being required to deliver its gas to Buyer against a higher pressure or *against any discrimination whatsoever,*" it should be so interpreted as to limit the effect of that portion of paragraph Fourth which reads as follows: "But during the summer months, beginning May 1st and ending October 31st, Buyer shall only be required to take only one-third of the volume of gas that was taken during the preceding six months." He therefore found that Red Jacket was entitled to damages calculated on a theoretical quantity of gas which the Master found it should have been permitted to deliver during the summer months. He measured the theoretical additional deliveries by the actual deliveries made by Red Jacket during the winter months. Red Jacket objects to this finding, because, it says, the evidence shows that Fuel held back Red Jacket's gas in violation of the agreement during the winter months. It contends that Red Jacket should be awarded damages for the gas it was not permitted to deliver during the winter months; and that the quantities which it claims should have been accepted during the winter months (which Red Jacket refers to as its "normal" winter production) should be used as the criterion in calculating the proportionate quantities which should have been accepted by Fuel during the summer months.

Fuel objects to this finding of the Master, because, it says, the Master has erroneously interpreted the pertinent provisions of the gas sales agreement. Fuel contends that the agreement gave it the right to shut off deliveries from Red Jacket's wells during the summer months after a quantity equal to one-third of Red Jacket's deliveries during the preceding winter months had been accepted.

■ The Master's interpretation of the agreement is, of course, a conclusion of law and not a finding of fact. Despite the very able and learned discussion by the Master and his elaborate reasons for the interpretation adopted by him, I am unable to agree with his conclusion. After careful study, I am convinced that paragraphs Third and Fourth contain no ambiguities. Why should we make intricate and uncertain language which, on its face, is clear and simple? Paragraph Third prescribes the conditions under which "all gas delivered into Buyer's lines" shall be delivered and accepted. It provides that Red Jacket shall "at no time" be "required to deliver gas to the Buyer" "against any discrimin-

ation whatsoever." Certain forms of discrimination are specifically mentioned; namely, higher head or line pressures against Red Jacket's gas than those maintained against the gas of other producers, or that of Fuel itself; and the use of compressors, boosters, pumps, or other artificial means to force gas into Fuel's lines. All these provisions are plainly intended to afford Red Jacket full equality of treatment *while its gas is being delivered.* I have searched in vain here and elsewhere in the agreement, *except in paragraph Fourth,* for any limitation, restriction, or other understanding whatever between the parties respecting the quantity of gas which Fuel must accept in any given period of time. Clearly, this matter was intended to be given special treatment; and that is exactly what the parties proceeded to do by the insertion of paragraph Fourth.

Coming then to paragraph Fourth: It is at once evident that the parties, by this provision of the agreement, expressed in clear and unequivocal language their understanding concerning the limitations on Red Jacket's right to deliver gas. During the winter months that right was to be unlimited. Red Jacket was to be permitted to deliver to Fuel, without any discrimination or disadvantage, all the gas which its wells could produce against line pressures to be equitably and indiscriminately maintained by Fuel; but during the summer months Fuel was given the right to limit deliveries from Red Jacket (if Fuel so desired) to a quantity not less than one-third of Red Jacket's next previous winter deliveries. No limitation was placed on the quantity of gas which Fuel might market during the summer months, nor upon quantities which it might purchase from other producers in the Mingo-Wayne gas district. To make it unmistakably clear that the provisions of paragraph Third prohibiting discrimination did not apply to summer deliveries by Red Jacket, the parties expressly stated in paragraph Fourth their understanding that Red Jacket's summer deliveries might be limited by the use of gate valves or other means to reduce the flow of gas, or by closing the wells off from the line entirely during two-thirds of the time, *or in any other manner;* any of which means of limitation, if applied to winter production, would amount to discrimination in violation of the agreement.

To adopt the construction in respect of summer-winter ratio contended for by Red

Jacket and approved by the Master would have the effect of rendering meaningless the express language of paragraph Fourth. No one argues that Fuel did not have the right to market as much of its own gas as it saw fit to market during the summer months. It is only contended that *if* Fuel should market more than one-third as much of its own gas as was marketed during the next previous winter period, it *must* accept a proportionately greater quantity from Red Jacket. If I grant this contention, how can I give effect to the language that "during the summer months" "Buyer shall only be required to take only one-third of the volume of gas that was taken during the preceding six months?" Why is specific provision made for the measurement of "one-third?" Obviously, had the parties intended the agreement to mean what Red Jacket contends it does mean, this provision would have been expressed in some such words as: "During the summer months," etc. "Buyer shall only be required to take a quantity of gas bearing at least the same proportion to Seller's deliveries during the next preceding six months (but not to be less than one-third thereof) as the gas taken by the Buyer from its own wells during said summer months bears to the gas taken by it from its own wells during the next preceding six months." This provision could have been inserted in the agreement in lieu of the other had the parties so agreed; but it can not be written in by the court and the other struck out. Courts do not make contracts for the parties. When the language is plain, as I hold it to be in this gas sales agreement, the court will not, by a strained interpretation of unequivocal terms, substitute its own idea of what it may think the agreement should have been in place of the actual agreement which the parties themselves have made.

I therefore sustain Fuel's objection to this finding of the Master, and overrule the objection of Red Jacket. I am of opinion that Fuel was not required by the gas sales agreement to accept during any summer period any gas in excess of a quantity equal to one-third of Red Jacket's deliveries during the previous winter period.

Having arrived at this conclusion, I deem it unnecessary to consider whether or not the Master adopted a proper method of calculating damages for the alleged violation of the summer-winter ratio provisions of the gas sales agreement. The Master calculated damages by using the average ratio between Red Jacket's production and that of Fuel for the entire years of 1931 and 1936. He applied this ratio to the total quantity of gas (390,041 mcf) produced by Fuel during the summer months of the so-called "damage period" (1931–1934) in excess of one-third of its production during the winter months, after first deducting 114,738 mcf which was produced by Fuel from the Slick Rock wells during that period. He thus concluded that Red Jacket should have been allowed to deliver 123,-032 mcf in excess of its actual summer deliveries. From these figures the Master made a further deduction of 1,232 mcf, which he found was actually delivered by Red Jacket in excess of one-third of its winter deliveries, leaving a net total of 121,800 mcf. Using this net total as a standard, the Master calculated damages as hereinafter discussed.

Red Jacket, as already stated, objected to the Master's findings on this phase of the case, because of the Master's failure to take into consideration what Red Jacket refers to as its normal winter deliveries, as distinguished from its actual winter deliveries. However, Red Jacket, as we have seen, did not object to the findings of the Master in respect of the Kirk Branch regulator and discriminatory line pressures. It was these alleged violations (in addition to the use of the Slick Rock compressor, which is hereinafter considered) which can furnish the only basis for Red Jacket's contention that it was entitled to theoretical "normal" winter deliveries in excess of its actual deliveries. For this reason, as well as on the merits of the case, its objection must be overruled.

Red Jacket argues that the court should award it further damages on the theory that Fuel did not accept during the winter months all the gas that Red Jacket should have been permitted to deliver in accordance with the terms of the agreement. Notwithstanding its failure to object to the Master's findings (that there was no evidence to support an award of damages by reason of either the operation of the Kirk Branch regulator or the maintenance of discriminatory line pressures), Red Jacket points to the production records of the two companies before, during, and after the damage period, and contends that they are in themselves proof of discrimination. It is true that deliveries from Red Jacket's wells fell off proportionately much **more**

than did the production from Fuel's own wells; but to say that this result was due to discrimination on the part of Fuel would be to indulge in pure speculation. Red Jacket's wells were mostly in different and shallower sands; they were cared for differently; new wells were added during the period by Fuel, whereas none were added by Red Jacket; and, as shown by charts exhibited to the court during the argument of the case, Red Jacket's wells had in 1942 fallen off to a point which indicated early exhaustion, whereas Fuel's wells had continued to maintain a substantial percentage of their earlier production. Therefore, even if this objection of Red Jacket's could be considered at all, in view of its failure to object to those findings of fact by the Master as to the elements which must enter into determination of the question, I conclude that the record of comparative production would provide no reliable guide or measure which could be of any assistance to the court.

*Slick Rock Compressor.*

The Master found as facts that the Slick Rock compressor was in operation from May 1, 1931, throughout the damage period; that it pumped gas from the nineteen Slick Rock wells at an intake (rock) pressure of four to five pounds, and propelled this gas into the Jude Branch Line at a pressure of seventy-five pounds or more; that the Slick Rock wells were oil wells from which the production of gas was of secondary concern; that prior to the operation of the compressor this gas had been allowed to escape into the air; that without the aid of a compressor it could not have been introduced into the Jude Branch Line; that Fuel operated the compressor against the protest of Red Jacket; that the amount of gas introduced through the compressor into the Jude Branch Line during the entire damage period was 210,455 mcf; that while the maximum capacity of the compressor is not in evidence, there is a strong presumption that it was no more than sufficient to handle expected production from the Slick Rock wells (although in a supplemental report he concluded that it "could have handled at least double its actual output"); and that if Red Jacket's production had been routed through the Slick Rock compressor, "it may be questioned," if Red Jacket's actual production would have been greatly increased. I adopt these findings of fact as the findings of the court. The Master concluded

from these facts that the operation by Fuel of the Slick Rock compressor was a violation of the terms of the gas sales agreement, and that Red Jacket was entitled to damages by reason thereof. He based his conclusion on the theory that Red Jacket should have been permitted to deliver the same quantity of gas as that produced from the Slick Rock wells, namely, 210,455 mcf, over and above its actual deliveries during the damage period. Red Jacket objected to this finding of the Master on the ground that the damages were not properly calculated. It contends that by reason of this alleged violation it should have been permitted during the entire damage period to deliver all its gas against a pressure no higher than the pressure on the intake side of the Slick Rock compressor, that is, four to five pounds. It argues that the undisputed testimony shows that against such a small pressure its wells would have produced and delivered "either four or four and one-half times" the quantity of gas actually delivered by it. It contends that damages should be awarded to it equal to the price of either 1,226,400 mcf (being the difference between its actual deliveries and four and one-half times its actual deliveries) or 1,051,200 mcf (being the difference between its actual deliveries and four times its actual deliveries). Red Jacket concedes that if this objection to the Master's report and this theory of calculation be sustained, its other objections become unnecessary and superfluous.

Fuel also objected to the Master's report in respect of the Slick Rock compressor on the ground (a) that the gas delivered into the line through this compressor was casing head gas, and not natural gas, and therefore was not comprehended within the terms of the gas sales agreement; (b) that the Master's finding that the operation of this compressor was a violation of the terms of the gas sales agreement was erroneous; (c) that the Master's finding that Red Jacket was damaged by Fuel's use of this compressor was erroneous; (d) that the Master's finding that Red Jacket should have been permitted to deliver 210,455 mcf of gas in addition to its actual deliveries was erroneous; and on several other grounds, exhaustively set out in its written objections filed with the court, but unnecessary to be embodied here, since they are substantially covered by the objections already mentioned. These in themselves are sufficient for a full consideration of the questions presented.

I adopt the findings of fact made by the Master, from which, together with other evidence in the case, I arrive at the following conclusions:

I am not impressed by Red Jacket's argument that (granting Fuel's operation of the Slick Rock compressor to have been a violation of the gas sales agreement) Red Jacket had the right to deliver all its gas against a pressure of four to five pounds. This argument grows out of a fundamental misconception of the situation created by the compressor. If Red Jacket were aversely affected at all by the operation of the compressor, it could only be due to the artificial pressure on the discharging side, whereby gas was forced into the Jude Branch Line. Whether the rock pressure at the wells were four pounds or sixty pounds could be of no significance, so long as it was not greater than the line pressure maintained in the Jude Branch Line. Until a pressure was built up strong enough to overcome the line pressure, none of this gas could have been put into the line; and certainly if none of it had gone into the line Red Jacket could not complain. Red Jacket has devoted much of its briefs to the emphasizing and elaborating of this fallacious theory, that it ought to have been allowed to deliver all its gas against a line pressure of four to five pounds; but I do not deem it necessary to say more than I have said in explanation of my conclusion that the theory is clearly untenable. I therefore overrule Red Jacket's objection to the findings of the Master on this phase of the case.

■ Fuel's objection on the ground that the gas pumped into the Jude Branch Line by the Slick Rock compressor was casing head gas, and therefore not included within the terms of the gas sales agreement, is also without merit. If there were a violation of the agreement, the substance of the violation would be the resulting increase in line pressure in the Jude Branch Line caused by the introduction of gas by any means other than the natural rock pressure of Fuel's wells. It could make no difference what kind of gas was pumped into the line. It is the effect on line pressure, and not the kind or quality of gas pumped into the line, which is to be considered.

■ The questions remain: Was the operation of the Slick Rock compressor, in the light of all the facts found by the Master and the other undisputed testimony in the case, a violation of the agreement?

Was Red Jacket damaged thereby? Did the Master correctly calculate the amount of damage? If not, is there any proof from which a reasonably correct calculation of damages can be made?

The Master's findings regarding all of these matters were conclusions of law rather than findings of fact.

Determination of the first of these questions requires consideration of certain language in paragraph Third of the gas sales agreement, and construction of that language so as to ascertain the meaning which the parties intended it to have. I refer to the following provisions: "nor shall Buyer allow other producers in said district to force their gas into Buyer's receiving line or lines by Compressors, Boosters, Pumps or other artificial means; nor shall the Buyer force gas produced by it into its own lines, by such means, unless employed in such manner as to work equally and fully to the aid and advantage of the Seller. It is agreed and understood, however, that Buyer may, at its option, erect or acquire, and maintain and operate, a Booster station in said district, through which Seller's gas and all other gas (including that produced by Buyer) received by Buyer from said district, shall pass on equal terms and under like conditions as to pressure, into Buyer's receiving lines."

It will be observed that, whereas Fuel was prohibited by this language from allowing any other producer in the Mingo-Wayne district to use a compressor, it was not itself denied that right. The last sentence of paragraph Third is complementary to the last clause of the next preceding sentence. Fuel was expressly given the right to use a booster station (equivalent to a compressor) on condition that it be operated equally and fully to the advantage of Red Jacket. Two rights were thus secured to Red Jacket: first, that no producer, including Fuel, should be allowed to crowd or choke back any of the gas produced from Red Jacket's wells by means of increased line pressures resulting from the operation by Fuel or others of a compressor or booster station; and secondly, that if by such means Fuel should be able to produce and market more gas than it would otherwise have produced and marketed, then Red Jacket was entitled to the benefit of whatever increased deliveries it could have made by use of the same means applied to its gas. The operation of a compressor by Fuel would not violate any con-

tract right of Red Jacket if Red Jacket's deliveries were not decreased thereby, and if, by applying the same means to Red Jacket's gas, its deliveries could not be increased.

The Master concludes from the fact that the Slick Rock compressor forced into the Jude Branch Line during the damage period 210,455 mcf of Fuel's gas, that it necessarily follows that this gas displaced a similar, or at least a substantial, volume of Red Jacket's gas. This conclusion might be valid if Red Jacket's wells were delivering their product into the Jude Branch Line, although even if that were the case, the twenty-four or more Fuel wells producing their gas through the Jude Branch Line must be taken into consideration. In other words, if all gas, both of Fuel and Red Jacket, had been delivered into the Jude Branch Line, the gas forced in through the compressor would have displaced other gas of Fuel and Red Jacket in proportion to the total number of wells of each, the capacity of the respective wells, and the difference between their rock pressure and the line pressure in the Jude Branch Line.

Since Red Jacket's wells delivered their gas not into the Jude Branch Line, but into the Kirk Branch Line, I must also take into account the fact that not only Red Jacket's wells, but nine of Fuel's wells, together with several wells of Southeastern Gas Company and Yates, also discharged their production into the Kirk Branch Line, and that Fuel's wells alone delivering gas into the Kirk Branch Line produced during the damage period, as is shown by an exhibit filed by Red Jacket as PX-61, more than twice as much gas as did Red Jacket's wells. The junction of the Kirk Branch Line with Line V was approximately 13 miles distant from the point on the Jude Branch Line where the Slick Rock compressor was installed. It is undisputed in the evidence that the pressure of gas traveling through a pipe line is decreased by the friction of the line, the degree of reduction in pressure being proportionate to the distance traveled by the gas. Taking into consideration, therefore, the volume of Fuel's own gas in the Jude Branch Line; the volume of Fuel's gas, together with that of the Southeastern Gas Company and Yates, in the Kirk Branch Line; and the natural decrease in pressure caused by friction between the location of the Slick Rock compressor and the junction of the Kirk Branch Line with Line V, it is plain that,

even if only these factors were to be considered, not more than a relatively small volume of Red Jacket's gas could have been displaced. There is a final factor, however, which must be taken into account, and which is more controlling than any of those already considered. The evidence shows, and it was so found by the Master, that the line pressures in both the Jude Branch Line and the Kirk Branch Line were artificially regulated by Fuel so as approximately to equalize pressures in the two lines. The inevitable result of this artificial regulation of line pressure was to destroy whatever effect the Slick Rock compressor may have had as a factor in increasing line pressure in the Kirk Branch Line; that is to say, in the presence of such equalized pressures, the introduction of additional gas into the Jude Branch Line by means of the Slick Rock compressor could not possibly have caused any displacement of Red Jacket's gas in the Kirk Branch Line. It is true that the Kirk Branch regulator was operated during only a year and a half of the damage period; but there is nothing in the record which indicates that the operation of the gate valve on the Jude Branch Line was discontinued at any time. I am of opinion, therefore, that the undisputed evidence and the findings of fact by the Master do not support the conclusion that Red Jacket's deliveries of gas were decreased by the operation of the Slick Rock compressor.

I now proceed to consider whether or not Red Jacket would have received any aid or advantage within the meaning of the agreement had any part of the gas from its wells been permitted to be forced into the line by the Slick Rock compressor, or by a similar compressor. For the purpose of determining this question, I view it from the angle which is most favorable to Red Jacket; that is, I consider whether or not a compressor similar to the Slick Rock Compressor both in construction and operation would have augmented Red Jacket's deliveries, had such a compressor been installed at the point of connection between any or all of Red Jacket's wells and the Kirk Branch Line. The evidence is that the Slick Rock compressor took the gas from wells with a very low rock pressure, and increased this pressure to a degree which was high enough to force it into the Jude Branch Line. If, therefore, by the application of similar forcible means by a similar compressor attached to any of Red Jacket's lines delivering into the Kirk

Branch Line, Red Jacket could have delivered more gas than it actually delivered, then Red Jacket may logically argue that it was deprived of an advantage. Red Jacket would, of course, be entitled to this advantage, if any, during the winter months only, since by the provisions of paragraph Fourth of the agreement Fuel had the right to use any mechanical appliances it saw fit to use during the summer months, so long as it fulfilled its obligation to take a quantity of gas from Red Jacket equivalent to one-third of Red Jacket's next previous winter deliveries.

Red Jacket filed as exhibit PX-64 a table which shows that the average line pressure in the Jude Branch Line during the years 1931 to 1934, inclusive, excluding the months of July, August, September, and October, was, respectively, 94.1, 98.3, 103.6, and 106. Without excluding these months it was, respectively, 97.3, 106.5, 101.3, and 103.3. By another exhibit filed by Red Jacket as PX-5, which shows the rock pressures of Red Jacket's several wells for the years 1931 and 1934, it appears that the lowest rock pressure of any Red Jacket well in 1931 was 102 pounds, and in 1934 100 pounds. However, the well with a rock pressure of 100 pounds in 1934 delivered its gas into the Kirk Branch Line through a gathering line which also received the gas of five other Red Jacket wells, and the average rock pressure of all six of these wells as shown was approximately 145 pounds in 1934. The well with the next lowest rock pressure in 1934 (105 pounds) delivered through the same gathering line as did four other wells, the average rock pressure of the five being 108 pounds.

It is therefore evident that the lowest pressure under which any of Red Jacket's wells delivered gas into the Kirk Branch Line in the years 1931 and 1934 was substantially higher than the average line pressure maintained in the Jude Branch Line during the winter months of these two years. Since the degree of pressure applied by the Slick Rock compressor was only that which was necessary to exceed line pressure in the Jude Branch Line, I conclude that had such a compressor, maintaining such degree of pressure, been used on the delivery lines at any point where Red Jacket's wells delivered gas into the Kirk Branch Line, it could not have resulted in advantage to Red Jacket, since Red Jacket's gathering line pressures were already higher than the pressure furnished by the compressor. In reaching this conclusion, I have assumed that the rock pressures of Red Jacket's wells for the years 1932 and 1933 were not out of proportion to those for 1931 and 1934. I find no exhibit or testimony which shows the rock pressures during those two years.

It seems that the Master arrived at virtually the same conclusion which I have reached respecting any possible or probable benefit to Red Jacket's wells had it been permitted to use the Slick Rock compressor, or a similar compressor. He says in his report: "Assuming that its (Red Jacket's) production had been routed through the Slick Rock compressor, it may be questioned if plaintiff's actual production would have been greatly increased." While the point can by no means be demonstrated to a mathematical certainty, I am constrained, by the facts which I have pointed out and by the conclusion reached by the Master after hearing all the testimony, to find that Red Jacket's right under the agreement to full and equal aid and advantage from any compressor which might be used by Fuel was not violated by the operation of the Slick Rock compressor.

■■ Although it may seem superogatory in view of the conclusion already announced, I believe I should discuss briefly the Master's method of calculating the damages which he concluded should be awarded to Red Jacket because of the operation of the Slick Rock compressor. It is axiomatic that damages must first exist if they are to be awarded. While a plaintiff whose rights have been violated will not ordinarily be denied damages if there is any evidence upon which even an approximate finding can be based, nevertheless, it is equally true that a court will not indulge in speculation or guesswork concerning the amount of damage. Therefore, unless Red Jacket can be said to have produced evidence in this case which would justify the court in finding that it sustained damages in *approximately* a certain amount, or in *at least* a certain amount, no damages should be awarded, even had there been a finding by the court that the sales agreement was violated. This is not a case in which a penalty should be assessed upon a mere showing of non-compliance with some provision of the agreement. The Master clearly saw this difficulty when considering Red Jacket's claims to damages by reason of alleged violations in connection with the Kirk Branch regulator and the summer-winter ratio of deliveries, but here

he seems to have lost sight of the principle involved. Having concluded that Red Jacket's rights were violated, he reasoned that since Red Jacket could not complain of such violation if it had been permitted by Fuel to deliver an additional quantity of gas equal to that produced by Fuel through the Slick Rock compressor, therefore, this exact quantity should be used as a basis for the calculation of Red Jacket's damages. I think this reasoning is unsound. There is no evidence from which it can be reasonably inferred that Red Jacket was prevented from delivering this quantity of gas (or, as I believe, any quantity) by the operation of the Slick Rock compressor; nor is there any evidence which sustains a conclusion that by the use of a compressor similar to the Slick Rock compressor Red Jacket could have delivered this additional quantity (or, as I believe, any additional quantity) of its gas to Fuel.

Considering all the facts, I am of opinion that the Master's adoption of the figure of 210,455 mcf as the basis for calculating Red Jacket's damages was arbitrary and can not be sustained upon any sound theory. I am of opinion further that there is no evidence in the case from which Red Jacket's damages, if any, could be even remotely guessed at.

Red Jacket contends that its damages should be awarded in a lump sum, calculated at 12¢ per mcf on the total quantity of gas which it claimed it had been prevented from delivering to Fuel during the damage period. The Master found that it was entitled only to interest for delayed deliveries, subject to certain conditions of payment exhaustively set out by the Master in his report. My decision on the merits of the case makes this point immaterial; but I may say that the Master's theory of calculation appears to me to be approximately correct. The method contended for by Red Jacket would result in its being paid twice for the same gas. The Master's theory is borne out by the subsequent history of production from Red Jacket's wells. It is shown by a chart with which I was furnished during the oral argument that the total production of Red Jacket's wells from 1935 to 1942, inclusive, was only slightly over 500,000 mcf, and that the wells apparently are near exhaustion, since the average yearly production during the last five years of that period was less than 30,-000 mcf. If such be the case, the total volume of alleged delayed deliveries which the Master used as the basis for the calculation of damages would amount to almost two-thirds of Red Jacket's gas reserves at the end of the damage period.

In accordance with the foregoing opinion, an order may be entered dismissing Red Jacket's bill of complaint.